Edgar L. Grubb v. Commissioner.
Grubb v. Commissioner
Docket No. 63708.
United States Tax Court
T.C. Memo 1961-153; 1961 Tax Ct. Memo LEXIS 195; 20 T.C.M. (CCH) 756; T.C.M. (RIA) 61153; May 29, 1961
*195 1. Held, that petitioner's net income for each of the taxable years is in the amount determined by respondent through use of the so-called net worth method, except for minor revisions with respect to petitioner's personal living expenses for the last three years. 2. Held, that a part of the deficiency for each of the taxable years is due to fraud with intent to evade tax, within the meaning of section 293(b) of the 1939 Code. An addition to tax under said section for each of the taxable years, approved. 3. Held, that the return of the petitioner for each of the taxable years 1941, 1942, 1944 and 1945, was false or fraudulent with intent to evade tax within the meaning of section 276(a) of the 1939 Code; and that accordingly, assessment and collection of the deficiency and addition to tax for each of said years are not barred by the statute of limitation. Petitioner did not plead the bar of the statute for the year 1943. L. B. Bolt, Jr., Esq., 613 Empire Bldg., Knoxville, Tenn., and Ben Kohler, Jr., Esq., for the petitioner. Jack D. Yarbrough, Esq., for the respondent. PIERCE Memorandum Findings of Fact and Opinion PIERCE, Judge: The respondent determined against the petitioner, *196 deficiencies in income tax through use of the net worth method, and also additions to tax for fraud, for years and in amounts as follows: Addition
Year
Deficiency
to Tax
1941
$13,006.62
$ 6,620.97
1942
27,626.11
13,813.06
1943
25,937.90
12,968.95
1944
52,139.71
26,069.86
1945
31,916.77
15,958.39 Also, respondent in his answer filed herein alleged alternatively that, if this Court should find that no addition to tax for fraud is applicable under section 293(b) of the 1939 Code [1] for the year 1942, then petitioner's tax liability for 1943 should be recomputed under section 6 of the Current Tax Payment Act of 1943; and he claimed an additional deficiency and a further addition to tax for fraud for 1943, in the respective amounts of $6,906.53 and $3,835.08, pursuant to said section 6 of the Current Tax Payment Act. The issues for decision are: 1. What is the correct amount of the petitioner's taxable income for each of the taxable years? 2. Was a part of any deficiency which may be found for any of the taxable years, due to fraud with intent to evade tax, so as to render petitioner liable for *197 additions to tax for fraud under section 293(b)? 3. Are the assessment and collection of any deficiency or addition to tax for any of the years 1941, 1942, 1944 or 1945, barred by the statute of limitation contained in section 275(a)? (The petitioner did not plead the bar of the statute as to 1943.) The answer to this issue will turn upon whether the return for any of the four above-mentioned years was false or fraudulent with intent to evade tax, within the meaning of section 276(a). Findings of Fact Some of the facts were stipulated. The stipulation of facts, together with the exhibits identified therein, is incorporated herein by reference. Edgar L. Grubb, the petitioner in the instant case, is (and was throughout the taxable years here involved) a resident of Knoxville, Knox County, Tennessee. He timely filed an individual Federal income tax return for each of the taxable calendar years 1941 through 1945, with the then collector of internal revenue for the district of Tennessee, at Nashville. Background Facts re Petitioner Petitioner was born in 1902 in Corryton, Knox County, Tennessee. His father, at all times material, operated a small dairy farm and also was a rural mail carrier. *198 Petitioner graduated from the high school in Knox County; and he then attended the University of Tennessee, located in Knoxville, where he received a bachelor of science degree in 1922. Following his graduation from college, he entered the University of Tennessee Medical School, located in Memphis; and he graduated from medical school in 1925, and received the degree of doctor of medicine. Thereafter petitioner served as an intern in a hospital apparently operated in conjunction with the medical school. He completed this internship in the early summer of 1926. While petitioner was attending medical school, he worked during the summer vacations; and he also worked at outside jobs while school was in session. At the time when he completed his internship, his property consisted principally of a car, some medical and surgical instruments, a policy of life insurance which he had just purchased, and some cash. In the summer of 1926, petitioner moved to Piave, Mississippi, which was a small sawmill town having a then population of approximately 4,000 people. Petitioner was there employed by a physician named E. A. Copeland; and the two of them thereupon conducted a medical practice as general *199 practitioners. Petitioner received $200 per month fees for services rendered to the employees of a lumber company, and also one-half of the fees received from other patients. In January 1928, Copeland moved away from Piave. At that time, he sold to petitioner a 3-bedroom bungalow which he had occupied as a residence, for a recited consideration of $2,500. And at the same time, Copeland sold jointly to petitioner and another physician named V. B. Martin, a drug store which he had theretofore operated, including the land, building, and stock in trade. Petitioner thereby acquired a twothirds interest in the drug store property, at a price of approximately $7,000. Petitioner made a cash down payment to Copeland (in an amount not shown by the record) for both his undivided interest in the durg store and also for the residence; and he gave a series of promissory notes to secure the balance. At about this same time petitioner established an infirmary in an unoccupied portion of the drug store premises. This infirmary originally had four or five beds, but it was soon expanded to include 15 beds. The father of a patient gave petitioner the operating room equipment for the infirmary. A refrigerator *200 which petitioner obtained, was purchased by him on the installment plan, with a down payment of $102.95 and installments of $24.75 each extending over several years. In May 1927, petitioner married Minnie Mae Conn of Hattiesburg, Mississippi, and two children were born of this marriage in 1929 and 1931, respectively. Petitioner's father-in-law lived in Hattiesburg; and he had an interest in a company which engaged in a lumber business and also in a plumbing supply business; but the extent of his interest is not established by the record. He died in 1930. There is no evidence as to whether a Federal estate tax return was filed for his estate; but there is evidence that no Federal income tax return was filed by him, or on his behalf, for any of the years 1927 through 1930. In 1930, petitioner decided to specialize in the eye, ear, nose and throat field. In the fall of that year, he left Piave to accept an appointment as a resident physician at the Eye, Ear, Nose and Throat Hospital at Memphis. Prior to his leaving Mississippi, he sold his residential property, and his interests in the drug store and infirmary. He at that time collected as many of his accounts receivable as he could; *201 and he took promissory notes for the remaining balances of such accounts. Petitioner remained at the Eye, Ear, Nose and Throat Hospital in Memphis until June 1932. During this residency, he received no compensation from the hospital, except his room and board. He did, however, derive some medical fees of unestablished amount from "wild cat" practice on the side. During the entire time that petitioner was a resident physician at the hospital in Memphis, his wife and children lived with the wife's mother at Hattiesburg, Mississippi. Prior to 1930, petitioner had purchased two ordinary life insurance policies, one in the face amount of $10,000 and the other in the face amount of $15,000, on both of which he paid annual premiums. On June 5, 1932, petitioner borrowed from the insurance company $176.70 on the $10,000 policy; and on February 8, 1932, he borrowed $285.75 from the insurance company on the $15,000 policy. About 4 years later, on July 10, 1936, petitioner borrowed $1,000 from the insurance company on the $10,000 policy, on which dividends of $53 had accrued. The disposition of the loan and the accrued dividends was as follows: Payment of previous loan
$ 176.70
Interest due
11.66
Premium due June 5, 1936
244.00
Check to petitioner
620.64
Total
$1,053.00
During *202 the summer of 1932, petitioner and his family moved to Knoxville, where he has since been engaged in the practice of medicine and surgery, specializing in diseases of the eye, ear, nose, and throat. From the time of their arrival in Knoxville until sometime in 1934, petitioner and his family lived with his parents on the latters' farm 15 miles from Knoxville. In 1934, petitioner and his wife and children moved into a modest home in Knoxville, for which he paid a monthly rent of $30. At or shortly after the time when petitioner returned to Knoxville in the summer of 1932, he opened a professional office in the Medical Arts Building. Petitioner had his own treatment rooms, but he shared a reception room with two other doctors, one of whom was a physician and the other a dentist; and petitioner also utilized the services of a combined receptionist and bookkeeper who was already then employed by said doctors. The name of this receptionist was Lela Mynatt (whose name, upon her subsequent marriage, became Lela Calver - she is hereinafter, for convenience, called "Lela"). Lela served as receptionist and bookkeeper for petitioner and the other two doctors until October 1934, when Olivette *203 Smith (hereinafter, for convience, called "Olivette") was employed as receptionist and bookkeeper by petitioner alone. Lela resumed working for petitioner in 1936, and was employed by him as receptionist and bookkeeper until November 1945. Olivette has been employed by petitioner continuously since October 1934; and during the taxable years, she functioned in the capacities of office nurse and confidential secretary. From 1932 to 1935, petitioner maintained a second office, in addition to that in the Medical Arts Building. He worked in his Medical Arts Building office until 4 P.M., and he then would go to his second office (which was located in the Burlington community, apparently a residential area of Knoxville) where he worked until late in the evening. Petitioner closed the Burlington office in 1935. In June 1936, petitioner purchased a residence and an adjoining lot. He made a down payment of $2,500 in connection with the purchase of the residence, and also assumed liability on an interest-bearing promissory note in the amount of $9,500. As regards the adjoining lot, petitioner paid for the same by means of four $100 promissory notes, bearing interest at the rate of 6 percent. *204 Also, in 1939, petitioner purchased an additional lot close to his residence, at a cost of $800 which he paid by making a down payment of $300, and giving his interest-bearing promissory note for $500. On December 31, 1939, petitioner moved his professional offices in Knoxville, from the Medical Arts Building to the Medical Center Building. His new offices covered the entire third floor of the Medical Center Building, and they included the following rooms: A reception room, a room which served as petitioner's private office (and which was also used for such other purposes as a place where petitioner could hold consultations and where Lela could perform certain of her clerical duties); 5 treatment rooms; 5 bedrooms (for postoperative patients); a room where refraction procedures could be conducted; and a combination operating room and X-ray room. Petitioner's history of filing Federal income tax returns, for the years 1927 through 1940, is as follows: Year
1927
No return
1928
Nontaxable return
1929
Nontaxable return
1930
Nontaxable return
1931
No return
1932
No return
1933
No return
1934
No return
1935
No return
1936
Nontaxable return
1937
Taxable return, $ 17.33 tax
1938
Taxable return, 23.14 tax
1939
Taxable return, 92.16 tax
1940
Taxable return, 279.96 tax
*205 Petitioner's Income-Producing Activities During the Taxable Years 1941-1945. Petitioner's primary source of income during the taxable years 1941-1945 here involved was his medical practice. There had been 17 physicians specializing in eye, ear, nose and throat work in 1932, when petitioner opened his office in Knoxville; but by 1942 or 1943, the number of such specialists had been reduced to four or five, due in part to physicians being called into the Armed Services. Coupled with this reduction in the number of eye, ear, nose and throat specialists in the Knoxville area, there occurred a simultaneous extensive improvement of general economic conditions in the locality. The Federal Government constructed an atomic energy plant at Oak Ridge, 23 miles from Knoxville; the Aluminum Company of America opened a large new large plant 10 miles from Knoxville; and several manufacturing establishments already then located in Knoxville were benefited by war contracts. Petitioner's medical practice increased greatly, and petitioner and his office staff were compelled to work long hours, in order to care for the needs of the patients who desired petitioner's services. In addition to his medical *206 practice, petitioner also engaged in the breeding, raising, and selling of cattle and other livestock on farms listed below which he purchased in the years and at the costs indicated: Cost
Year
or Other
Acquired
Name of Farm
Acreage
Basis
1941
Beaver Creek Farm
398.09
$30,323.52
1943
Cedar Bluff Farm
105.62
25,889.30
1944
Jenkins Farm
152.00
16,066.40
1944
Sterchi Farm
117.00
24,140.50
Petitioner also owned or acquired a number of rental properties during the taxable years. The first rental property which petitioner acquired was a house and lot on Bonny Street in Knoxville, which he purchased in 1939 and which he sold during 1944. On July 28, 1942, petitioner purchased an office building known as the Cherokee Building for which he paid $38,434.39. Petitioner sold this Cherokee Building in 1945. On January 28, 1943, petitioner purchased another office building in Knoxville, which was called the Ingersoll-Rand Building, and for this he paid $16,975.40. Petitioner likewise sold the Ingersoll-Rand Building during 1945. In addition, in May 1943, petitioner purchased a brick warehouse in Knoxville, for $7,859.51; and he sold said warehouse on November 29, 1943, for a consideration of $8,000. Thereafter on March *207 29, 1945, petitioner purchased improved real property located on East Magnolia Avenue in Knoxville (said property was sometimes called the "Branner property") which had a total cost basis to petitioner of $33,353.10. In addition to his medical practice, his operation of farms, and his ownership of rental properties, petitioner also made loans of money to individuals and made certain other investments in unimproved real estate, in United States bonds, and in business enterprises. As regards the investment in unimproved real estate, during 1940 petitioner and two licensed real estate dealers acquired a group of lots, and in addition 50.52 acres of land, in Sequoyah Hills Subdivision of Knox County. On July 7, 1942, the Tennessee Valley Authority purchased the above-mentioned 50.52 acres, and in addition 33 of the lots owned by petitioner and his co-venturers. Additional sales were made during 1940 and 1941, but neither the quantity of property sold, nor the purchase prices, nor the terms, nor the identity of the purchasers is established by the record. No sales were made from the Sequoyah Hills Subdivision in either 1944 or 1945. Also, in October 1944, petitioner purchased two lots on *208 East Jackson Avenue in Knoxville, at a total cost of $10,280.20. Petitioner owned United States bonds (Series E) in the following amounts, on the dates indicated: Cost of
December 31
Bonds Owned
1942 $150
1943
675
1944
975
1945
975
As found hereinabove, petitioner also made investments in certain business enterprises during the taxable years. The first of these investments was made in 1944, in a partnership known as Grubb-Bevins Company. This investment was made during the latter part of 1944, when petitioner entered into an agreement with an individual named E. S. Bevins for the purpose of operating a retail farmers' supply store in Knoxville, to be known as Grubb-Bevins Company. Petitioner invested a total of $17,985.43 in this business in 1944, and an additional amount of $85,724.95 in 1945. During the year 1945, petitioner acquired the controlling interest in a corporation called Chapman Drug Company, in Knoxville, through purchase of shares of its common and preferred stock, the bulk of which was apparently acquired from the estate of the deceased president of the corporation. Petitioner's investment in the stock of Chapman Drug Company totaled $170,018.38 in 1945, and was largely financed *209 by means of a loan from a Knoxville Bank. Petitioner became president of the corporation, and received as salary during 1945, the amount of $6,000. Facts re Books and Records, Office Routine, and Handling and Disposition of Income of Petitioner's Medical Practice The records and books of account maintained in petitioner's medical office were: Patients' records cards. - These were 5inch X 7inch cards on which were recorded the patient's name, address, symptoms, medical history, and petitioner's diagnosis and treatment on each occasion when a patient consulted him. Professional appointment books. - These were office diary-type books in which, on a day-by-day basis, the names of patients were entered in the order in which they were to be treated by petitioner. [2] Also, in some instances, the amount charged or paid for treatment was entered opposite the patient's name. Cash receipts books. - These were bound volumes, containing printed forms of receipts with carbon copies, in which were recorded cash *210 payments received from patients and also, in certain instances, payments made by check. The original receipt was given to the patient, and the carbon copy remained in the book. Patients' accounts receivable ledger sheets. - These were ledger sheets on which were recorded charges for professional services to those patients who did not pay at the time of treatment; and also credits for payments made by the patients on their accounts. Office expense book. - This was a journal in which was recorded only those office expenses (e.g., for laundry or for medicines and drugs) which were paid from cash on hand in the office, as distinguished from those paid by checks drawn on petitioner's professional bank account. Files on optical income. - These were cardboard folders in which there were kept, by years, monthly statements from optical companies which had sold eye glasses prescribed by the petitioner for his patients. The practice of these companies was to remit to petitioner a certain portion of the selling price of each pair of glasses. Such remittances (which are hereinafter, for convenience, called "rebate payments") were made on a monthly basis, and were accompanied by the above-mentioned *211 statements to show the computation of the amount remitted to petitioner. When a patient came to petitioner's offices, the receptionist (usually Lela) would either prepare a patient record card if the patient was making his first visit, or she would take his pre-existing record card from her files if the patient had been treated before by the petitioner. The receptionist then listed the patient's name in the professional appointment book, and sometimes indicated the treatment to be given (e.g., refraction, for the purpose of prescribing glasses). When the patient's turn came to be treated, he was sent with his record card to one of the treatment rooms, where he received his treatment. Petitioner noted upon the record card the diagnosis and treatment administered or prescribed, and then sent the patient back to the receptionist's desk to make arrangements for payment. The petitioner did not personally take any payments from his patients. Upon returning to the receptionist's desk, the patient would either pay the charge for professional services, by cash or by check, or he would ask to be sent a bill therefor. Where a patient at the time of his visit made a cash payment, the receptionist *212 issued him a receipt from the cash receipt book, a carbon copy of such receipt being simultaneously made. If the patient paid by check, he would not be given a receipt unless he requested one. If a receipt was given for a payment by check, a notation was made on the receipt to show that it represented a check payment. In the event that a patient did not pay for treatment at the time of his visit, the receptionist (presumably using the patient's record and/or the professional appointment book) would subsequently post a charge to an account receivable ledger sheet for the patient. Patients would thereafter make payments on their accounts, either by mail or in person, and either by check or in cash. If a patient made a check payment by mail, the receptionist would put the check in a metal box kept in her desk drawer, and at her convenience she would thereafter post the payment received, as a credit to the patient's account receivable ledger sheet. The record is not clear as to the method of handling cash payments on account received through the mail. There is no indication that a cash receipt was issued for such a payment. As regards payments on account made by patients personally, if *213 such payments were in cash, a receipt was issued therefor. The record is not clear as to the system used to assure that such cash payments were credited to the patient's account receivable ledger sheet, but apparently such credits were made. Check payments on account made by patients personally were handled in the same way as above described for check payments received through the mail. The handling of the cash and checks received from patients in the various ways above described was as follows: Initially all cash and checks were placed by the receptionist in the above-mentioned metal box which was kept in a drawer of her desk. At the end of each day, the receptionist would turn over these cash receipts to petitioner personally; and petitioner then kept such currency in a file drawer of a metal cabinet in the above-mentioned room which served as his private office, and used it for various purposes hereinafter mentioned. [3] *214 The checks received from patients were initially placed by the receptionist in the said metal box in the drawer of her desk; and at the end of each day, she then put these checks in a drawer of a filing cabinet standing directly behind her desk. Subsequently, those checks which represented payments by patients on their accounts were posted to *215 their accounts; and thereafter, these checks together with all other checks received from patients were placed by the receptionist in a compartment in petitioner's desk in his private office. Petitioner maintained a bank account for his medical practice in the Bank of Knoxville (hereinafter called the "professional bank account"); but it is conceded that large amounts of the receipts from his medical practice were not deposited in this account. The only currency deposits made to petitioner's professional bank account during the years 1942 through 1945, were as follows: Date
1942
1943
1944
1945
5-11-42
$3,131
9-23-44
$1,000
6-19-45
$1,400.00
3-20-45
1,955.13
9- 8-45
200.00
9-18-45
1,500.00
12-12-45
108.00
Totals
$3,131
None
$1,000
$5,163.13 Also it is conceded that numerous checks received from petitioner's patients were not deposited in the professional bank account. In addition to the above-described receipts from patients, petitioner had other income from his medical practice. Included in such other income were the above-described rebate payments remitted to petitioner by optical companies. The following is a summary of the payments received by petitioner from such companies during the taxable years: Optical
Company
1941
1942
1943
1944
1945
Tennessee
$3,322.93
$ 5,819.89
$ 7,456.42
$ 9,646.02
$ 9,765.31
Knoxville
1,570.76
2,445.22
2,582.50
1,918.90
2,020.53
Southeastern
1,018.25
553.11
475.22
556.58
666.23
American
696.12
1,356.82
1,243.55
676.35
Clancy
354.50
365.50
Totals
$6,608.06
$10,155.04
$11,757.69
$13,152.35
$12,817.57
Total (1941-1945)
$54,490.71
As *216 hereinabove found as a fact, such rebate payments from optical companies were received by mail each month, and each payment was accompanied by a statement wherein appeared a computation of the amount of the payment. When checks for such payments were received, the receptionist frequently would leave the envelopes containing the same, unopened, on the desk in petitioner's private office. [4] Some of these checks were deposited in petitioner's professional bank account, while others were used by petitioner for various purposes hereinafter described. During the years 1944 and 1945, petitioner performed surgery on the patients of another physician, a pediatrician by the name of Joe T. Smith, in said physician's office. Smith billed his patients in amounts sufficient to cover both the charges for his own services, as well as those for services rendered by the petitioner. *217 Thereafter, at intervals, Smith remitted to petitioner the latter's portion of the amounts received from Smith's patients; and each remittance was accompanied by a letter showing the names of the patients with respect to whom the remittances were being transmitted. A schedule showing how the receipts from Smith were disposed of by petitioner is hereinafter set forth. During each of the taxable years, petitioner received checks from a corporation known as Holston Laboratories, Inc. In the early 1930's, petitioner had, with two other physicians, formed said corporation for the purpose of manufacturing pharmaceutical preparations. Petitioner furnished one or two formulas which were used in the manufacture of such preparations, and he had received therefor stock of the corporation. At some time in or prior to 1940, petitioner disposed of his stock in Holston Laboratories to an individual named James L. McKay (more fully identified herein below), who became the treasurer of the corporation. The checks received from said Laboratories in the taxable years, were in some instances marked as being for professional services, but in other instances the purpose for which they were drawn did not *218 appear on the checks. The record is not clear as to whether said checks were for some sort of services rendered by the petitioner to the corporation, or for professional services rendered to McKay by petitioner, or whether they represented the purchase price of the stock which petitioner had sold to McKay. There is no evidence of any record having been made by or for petitioner of the receipt of the above-mentioned checks of Holston Laboratories, Inc. As hereinabove found as a fact, not all of petitioner's receipts from his medical practice were deposited in petitioner's professional bank account. Petitioner used undeposited currency and checks received from his patients, for such purposes as paying off his personal notes at banks in Knoxville, paying notes issued by petitioner to the persons (or their agents) from whom he had purchased farms and other properties, and for deposit in a bank account which he maintained in the Morris Plan Bank in Knoxville for use in connection with his farming activities. (The last-mentioned account is hereinafter referred to as the Beaver Creek Farm account.) In addition to the professional bank account and the Beaver Creek Farm account, petitioner *219 maintained another account in the Bank of Knoxville beginning in April 1939, under the name of "E. L. Grubb, Trustee" account. He also had a safety deposit box in the Bank of Knoxville throughout the taxable years, access to which was limited to petitioner and Olivette. Currency payments from petitioner's patients were put in this box on occasions by Olivette. Petitioner did not have any such safety deposit box during any of the preceding period that he was in Knoxville from the summer of 1932 until April 1939. Large amounts of undeposited receipts for the years 1944 and 1945 were used as the source of petitioner's investment in the above-mentioned Grubb-Bevins Company. The initial deposit made in the bank account of said company which was opened on December 19, 1944, amounted to $18,045.43. Petitioner supplied the funds for said initial deposit, consisting of currency in the amount of $15,899 and numerous patients' checks totaling $2,149.43. 4a In the succeeding year, 1945, petitioner invested an additional $85,724.95 in said company. The following table reflects the dates, amounts and sources of the funds used for petitioner's investment in the Grubb-Bevins Company during the year *220 1945; AMOUNTS AND SOURCES OF FUNDS INVESTED BY PETITIONER
IN GRUBB-BEVINS COMPANY DURING 1945
From
From
From
South-
Cash
Tennessee
Knoxville
eastern
Miscella-
from
Optical
Optical
Optical
neous
Date
Patients
Co.
Co.
Co.
checks
Total
2-15-45
$ 978.03
$ 978.03
2-28-45
$ 707.82
1,557.23
2,265.05
3-13-45
555.03
811.10
1,366.13
3-17-45
1,090.00
1,090.00
3-20-45
$ 1,800.00
1,800.00
3-29-45
1,400.00
1,400.00
4- 4-45
3,500.00
78.50
3,578.50
4-11-56
802.00
802.00
4-23-45
871.21
871.21
5- 1-45
783.30
$141.44
611.60
1,536.34
5-10-45
3,208.95
3,208.95
5-15-45
767.61
137.52
4,000.00
4,905.13
5-26-45
1,350.00
1,350.00
5-31-45
3,270.00
3,270.00
6- 5-45
$ 46.12
696.56
742.68
6- 7-45
17.00
17.00
6- 7-45
361.46
361.46
6- 7-45
4,200.00
4,200.00
6-28-45
899.45
245.10
60.24
907.03
2,111.82
7-10-45
1,734.29
710.87
167.35
35.62
1,351.84
4,000.00
6-29-45
4,500.00
4,500.00
7-10-45
3,000.00
3,000.00
8- 2-45
2,900.00
2,900.00
8-10-45
2,300.00
700.00
3,000.00
8-13-45
1,551.55
1,551.55
9- 7-45
862.06
862.06
9-11-45
2,060.00
2,060.00
9-13-46
1,046.47
1,046.47
9-14-45
915.00
915.00
9-20-45
1,150.58
1,150.58
10-11-45
1,000.00
560.31
1,560.31
10-15-45
9,966.67
9,966.67
10-16-45
661.16
661.16
10-30-45
850.00
111.00
961.00
11- 1-45
3,200.00
124.00
3,324.00
11-12-45
183.84
1,694.03
1,867.87
12-13-45
2,575.00
2,575.00
$45,108.26
$4,424.08
$691.41
$141.98
$31,390.24
$81,755.97
6-29-45 Payment for machinery
3,171.54
11-30-45 Payment for machinery
797.44
$85,724.95
*221 The following table shows the disposition made of the checks which petitioner received as rebates from the optical companies: 1941
1942
1943
1944
1945
Deposited E. L. Grubb Account,
Bank of Knoxville
$ 503.17
$ 126.50
$ 2,260.35
$ 1,337.39
$ 4,957.01
Bank of Knoxville [1]
2,013.54
8,115.37
4,233.54
2,793.66
2,582.61
Purchase of real estate
806.22
2,419.48
2,888.51
Deposited E. L. Grubb, Trustee
Account, Bank of Knoxville
1,913.17
996.09
2,072.20
Deposited Beaver Creek Farm Ac-
count, Morris Plan Bank
1,673.05
2,910.74
20.48
Other (W. P. Seaton)
175.18
471.57
Deposited Grubb-Bevins Account,
Bank of Knoxville
678.28
5,257.47
Unexplained
3,285.13
Totals
$6,608.06
$10,155.04
$11,757.69
$13,152.35
$12,817.57
*222 Insofar as the checks received by petitioner from Joe T. Smith are concerned, the following table shows the disposition made of such checks SCHEDULE OF RECEIPT AND DISPOSITION OF CHECKS RECEIVED BY PETITIONER
FROM JOE T. SMITH DURING THE YEARS 1944 AND 1945
Date of
Disposition
Amount
Disposition
1944
$ 185
2/21
Paid on note of petitioner, Bank of Knoxville
170
Unknown
185
5/ 3
Paid on note of petitioner, Bank of Knoxville
175
6/ 6
Deposited in Beaver Creek Farm account, Morris Plan Bank
350
6/12
Deposited in E. L. Grubb, Trustee, account, Morris Planbank
275
7/18
Deposited in Beaver Creek Farm account, Morris Plan Bank
190
8/23
Deposited by W. P. Seaton
485
11/16
Deposited in Beaver Creek Farm account, Morris Plan Bank
340
11/ 9
Deposited in Beaver Creek Farm account, Morris Plan Bank
305
Unknown
$2,660
1945
$ 405
2/28
Deposited, Grubb-Bevins Co., account, Bank of Knoxville
125
4/ 4
Deposited in Grubb-Bevins Co., account, Bank of Knoxville
345
5/15
Paid on note of petitioner, Park National Bank
600
7/10
Deposited in Grubb-Bevins Co., account, Bank of Knoxville
565
9/14
Deposited in Grubb-Bevins Co., account, Bank of Knoxville
520
11/12
Deposited in Beaver Creek Farm account, Morris Plan Bank
60
12/22
Deposited in Beaver Creek Farm account, Morris Plan Bank
305
Unknown
$2,925
*223 With regard to the expenses of petitioner's medical practice, these were handled in one of two ways. Some of the expenses (as, for example, laundry and drugs and medicine) were paid by the receptionist (usually this was Lela) out of cash on hand in the office which had been received from petitioner's patients. Lela kept a record of the expenses which she thus paid in the above-described office expense book. Other expenses (as, for example, the rent on petitioner's offices) were paid by checks, which were drawn by Olivette. No record of expenses paid by check was made in the just mentioned office expense book. Facts re Records Kept for Petitioner's Farms and Miscellaneous Other Income-Producing Activities For the years 1942 through 1945, petitioner himself maintained records with respect to his farms in his own handwriting. Such records consisted of two bound books in which he recorded the following data: Cost of cattle purchased; cost of cattle sold; receipts from the sale of cattle and other farm products; and expenses incurred in his farming operations. As regards the records maintained with respect to petitioner's rental properties, there were none except monthly statements from *224 the rental agents who had charge of the management of the Cherokee Building, which showed only the rents collected from the tenants of the buildings and the expenses of building operation paid by the agents. There is no evidence of any books and records maintained by petitioner regarding: (1) His income as a co-venturer in the Sequoyah Hills Subdivision venture; (2) his purchases and sales of other real estate; or (3) his investments in the Grubb-Bevins Company. Facts re Preparation of Tax Returns Petitioner's Federal income tax return for each of the years 1941 through 1945, was prepared by James L. McKay. McKay was not a certified public accountant, but he had worked for a firm of certified public accountants in Knoxville until about 1936. Thereafter, he was employed as accountant and office manager for a manufacturing concern; and, in his spare time, he also kept the books of account for the country club of which petitioner was a member. Also, he was, as above found, treasurer of Holston Laboratories, Inc. In 1945, he became auditor of Grubb-Bevins Company; and in the same year or in 1946, he became secretary-treasurer of the Chapman Drug Company. For each of the years 1941 through *225 1944, McKay was furnished information regarding the income and expenses of petitioner's medical practice by petitioner's receptionist. Lela. As regards petitioner's professional income from his practice, Lela totaled the cash receipts as reflected in the above-described cash receipts book, and to this amount she added the total of those checks received in the petitioner's office, which had been deposited in the professional bank account. She did not take into consideration the checks which petitioner had used for his investments and other purposes, and which had not been deposited in his professional bank account. The medical practice expenses were detailed from the cash disbursements book and from the checks issued by Olivette in payment of office expenses. Petitioner himself furnished McKay with information relative to income from his farms, rents, interest, and sales of real estate, for all of the years 1941 through 1945. Lela left petitioner's employment in November 1945; and McKay himself computed petitioner's professional income for that year, utilizing the cash receipts books for that year, petitioner's bank statements for the professional bank account, cancelled checks for *226 said account, and the office expense book. Facts re Respondent's Determination Agents of the respondent began their investigation of the petitioner's returns for the taxable years in the instant case in the summer of 1945; but most of their work was done in the succeeding years 1946 and 1947. The agents were satisfied that petitioner's income was not accurately reflected by his books and records; and they resorted to the use of the increase in net worth plus nondeductible expenditures method for computing petitioner's net income for each of the years involved. In constructing such net worth statement, respondent's agents canvassed all Knoxville banks and made analyses of petitioner's accounts therein; consulted employees and third parties with whom petitioner had dealt; and had at least two conferences with petitioner and his representatives. The following schedule shows the determinations made by respondent in his notice of deficiency herein, as to: Petitioner's assets, his liabilities, his net worth, his increase in net worth, his nondeductible expenditures and certain other adjustments, his net income as determined through the net worth method, his reported taxable income, and *227 his understatement of income for each of the taxable years involved: Computation of Net Income by Net Worth Method
Year
12/31/40
12/31/41
12/31/42
12/31/43
12/31/44
12/31/45
ASSETS: Cash on Hand
None
None
None
None
None
$ 14,965.75
Cash in Banks: Bk. of Knoxville - E. L. Grubb
$ 2,142.89
$ 481.89
$ 78.40
$ 744.35
$ 1,484.26
(304.41)
Morris Plan Bk. - Beaver Creek Farm
None
None
None
(323.67)
(58.60)
(199.20)
Bk. of Knoxville - E. L. Grubb, Trustee
None
None
495.94
185.59
302.48
285.48
Park Natl. Bk. - Cherokee Bldg.
None
None
1,803.83
651.05
1,251.74
2,410.79
Commercial Natl. Bk. - E. L. Grubb
None
None
850.62
1,303.87
1,303.87
1,303.87
Morris Plan Bk. - Savings Acct.
551.18
560.61
571.87
580.95
586.76
592.64
Notes Receivable
13,650.00
17,083.40
20,290.00
24,801.00
21,076.00
78,555.00
Professional: Office furniture & equipment
8,793.62
8,793.62
8,838.62
8,986.12
9,348.52
9,348.52
Automobile
1,300.00
1,450.00
1,450.00
1,450.00
1,550.77
1,550.77
Rental Property: House & Lot, 215 Bonny St.
1,000.00
1,000.00
1,000.00
1,000.00
None
None
Cherokee Bldg., 402 W. Church Ave.
None
None
38,434.39
38,434.39
38,434.39
None
Ingersoll-Rand Bldg., 412 W. Jackson
None
None
None
16,975.40
16,975.40
None
Jackson Ave. Lots
None
None
None
None
10,280.20
10,280.20
Branner property, Magnolia Ave.
None
None
None
None
None
33,353.10
Farm Property: 217.52 acres - Phoenix Mutual
180.57 acres - Brown Farm
None
20,657.39
20,657.39
20,657.39
20,657.39
20,657.39
152 acres - Jenkins Farm
None
None
None
None
16,066.40
None
50.62 acres - Shultz Farm
None
None
None
12,773.35
12,773.35
12,773.35
55 acres - Prater Farm
None
None
None
13,115.95
13,115.95
13,115.95
13 acres - Sterchi Farm
None
None
None
None
4,508.50
4,508.50
104 acres - Sterchi Farm
None
None
None
None
19,640.00
19,640.00
Well
None
None
None
None
500.00
500.00
Buildings & equipment
None
14,967.46
17,757.65
24,834.83
40,935.35
33,842.01
Breeding stock
None
825.00
4,025.00
4,025.00
9,900.00
9,900.00
Horse
None
None
None
165.00
165.00
165.00
Inventories: Cattle
None
7,418.00
25,850.91
29,549.26
25,076.46
24,051.46
Turkeys
None
None
None
None
None
54.00
Investments: Equity in Sequoyah Hills Subdiv
4,020.73
3,932.18
2,093.58
1,391.50
1,391.50
1,391.50
Grubb-Bevins Co.
None
None
None
None
17,985.43
102,209.79
Chapman Drug Co.
None
None
None
None
None
170,018.38
Tennessee Oil Co.
None
None
None
None
None
2,726.40
War Savings Bonds
None
None
150.00
675.00
975.00
975.00
Other Property: Personal residence
12,000.00
12,000.00
12,000.00
12,000.00
12,000.00
12,000.00
Holston Hills Lots
1,500.00
1,500.00
1,500.00
1,500.00
1,500.00
1,500.00
Deferred Charges - prepaid insurance
None
None
796.10
487.93
179.76
None
Total Assets
$ 44,958.42
$ 90,669.55
$158,644.30
$215,964.26
$299,905.88
$582,171.24
LIABILITIES: Notes and Mortgages Payable
None
$ 9,500.00
$ 28,000.00
$ 36,170.36
$ 42,640.00
$200,759.96
Accrued taxes: 217.52 acres - Phoenix Mutual
None
144.90
None
None
None
None
180.57 acres - Brown Farm
None
120.75
None
None
None
None
152 acres - Jenkins Farm
None
None
None
None
119.00
None
13 acres - Sterchi Farm
None
None
None
None
8.50
None
Cherokee Bldg.
None
None
752.00
None
None
None
Ingersoll-Rand Bldg.
None
None
None
179.30
None
None
Jackson Ave. - lots
None
None
None
None
68.00
None
Branner property
None
None
None
None
None
853.10
Other liabilities: Chapman Drug Co.
None
None
None
None
None
23,408.88
Sequoyah Hills Subdivision
$ 4,020.73
3,748.80
None
None
None
None
Reserve for depreciation
4,481.00
5,588.90
8,302.46
11,962.99
15,675.92
17,980.42
Unrealized profits
None
None
None
None
None
27,238.36
Total Liabilities
$ 8,501.73
$ 19,103.35
$ 37,054.46
$ 48,312.65
$ 58,511.42
$270,240.72
Net Worth
$ 36,456.69
$ 71,566.20
$121,589.84
$167,651.61
$241,394.46
$311,930.52
Less: Net worth at close of preceding year
36,456.69
71,566.20
121,589.84
167,651.61
241,394.46
Increase in Net Worth
$ 35,109.51
$ 50,023.64
$ 46,061.77
$ 73,742.85
$ 70,536.06
Add: Personal living expenses and other unallowable
amounts paid: Withdrawals for personal expenses
6,000.00
6,760.20
9,687.38
7,874.14
9,495.71
Federal income taxes paid (net)
279.96
1,750.38
3,937.64
9,346.19
10,629.84
Contributions
312,00
740.00
Taxes-Personal
141.18
147.20
Total
$ 41,389.47
$ 53,534.22
$ 59,686.79
$ 91,416.36
$ 91,548.81
Less: Nontaxable portion of long-term capital gains
(93.13)
(206.88)
(7,389.90)
Standard deduction elected in 1944 and 1945 returns
(500.00)
(500.00)
Net income as revised
$ 41,389.47
$ 58,534.22
$ 59,593.66
$ 90,709.48
$ 83,658.91
Net income reported in returns
12,073.45
13,608.37
21,272.76
21,952.14
42,097.41
Understatement of net income
$ 29,316.02
$ 44,925.85
$ 38,320.90
$ 68,757.34
$ 41,561.50
*228 The parties have agreed, by stipulation, to the correctness of the amounts of all assets, liabilities and adjustments shown in the foregoing schedule with the exception of "cash on hand," "cattle," and "personal living expenses." Petitioner, in addition, claims that he was indebted to his father for a loan in the amount of $12,500 as of December 31, 1945; and that accordingly, an additional liability of that amount should have been included in the net worth schedule as of said date. With respect to the foregoing disputed items, the Court makes the following findings of fact: Cash on hand. - Petitioner had some cash on hand (as distinguished from cash on deposit in banks) as of December 31 of each of the years 1940 through 1944; but the amount thereof can not be determined from the evidence of record. Cattle on hand. - Petitioner's investment in cattle at December 31 of each of the years 1941 through 1945, was correctly determined by the respondent. Personal living expenses. - Pursuant to concession by the respondent contained in his brief, the amounts of petitioner's personal living expenses for each of the years 1943, 1944, and 1945, were slightly less than those which respondent *229 originally determined. Such living expenses were: Correct amount of
Year
living expenses
1943
$8,864.51
1944
7,667.36
1945
9,283.19 The respondent correctly determined petitioner's personal living expenses for the years 1941 and 1942, as follows: 1941
$6,000.00
1942
6,760.20
Liability for asserted loan to petitioner by his father. - Petitioner was not indebted to his father at December 31, 1945, in the amount of $12,500, or in any other amount. The respondent was correct in not including a liability in the amount of $12,500 in the net worth schedule, as of December 31, 1945. Facts re Omissions of Income from Petitioner's Returns In August 1954, petitioner employed W. Ben Davis, a certified public accountant, to make an examination of his books and records, for the purpose of ascertaining what petitioner's income was for the years 1942 through 1945, according to said books and records. Davis computed petitioner's professional income for each year in said period by adding together the following: (1) Cash receipts as shown in the cash receipts books for each such year; (2) amounts credited to the patient's account receivable ledger cards for each year; and (3) amounts shown on statements in petitioner's *230 office for such income items as rebate payments by optical companies. The following table shows the amounts of petitioner's net income as computed by the accountant Davis, the net incomes reported by the petitioner on his Federal income tax returns, and the resultant understatements of net income according to Davis' computations: 1942
1943
1944
1945
Petitioner's net income per
Davis' computation
$43,365.25
$36,496.35
$48,283.85
$51,187.90
Petitioner's net income per Fed-
eral income tax return
13,608.37
21,272.76
21,952.14
42,097.41
Understatement
$29,756.88
$15,223.59
$26,331.71
$ 9,090.49
The following table shows the amounts of gross receipts from petitioner's farming activities which are reflected in the farm record books that petitioner himself maintained, the amounts of farm receipts which he reported on his income tax returns, and the unreported farm receipts, for the years 1942 through 1945: 1942
1943
1944
1945
Farm receipts per petitioner's
records
$16,724.64
$12,003.22
$16,941.11
$ 4,578.36
Farm receipts per returns
10,314.51
9,948.22
16,941.11
2,979.77
Unreported farm receipts
$ 6,410.13
$ 2,055.00
$ 1,598.59 Petitioner also received in connection with his farming activities, taxable payments from the Agricultural *231 Adjustment Administration for each of the years 1943, 1944, and 1945, in the respective amounts of $111.96, $115.66, $228and. None of these payments was either recorded by petitioner in his farm record books or reported in his Federal income tax returns. The parties have stipulated that petitioner received interest income in each of the years 1941 through 1945. The following table shows the stipulated amount of interest income received by petitioner, the amount of interest income reported by him in his tax return, and the amount of petitioner's unreported interest income, for each of the years 1941 through 1945: 1941
1942
1943
1944
1945
Petitioner's interest income, per stipulation
$1,358.07
$1,416.76
$675.43
$525.16
$2,357.72
Petitioner's interest income, per tax return
1,358.07
None
None
None
1,864.75
Unreported interest income
None
$1,416.76
$675.43
$525.16
$ 492.97
The parties have stipulated that petitioner's share of net profits from the sales of lots and acreage in the Sequoyah Hills Subdivision for each of the years 1941, 1942, and 1943, was in the respective amounts of $183.38, $5,730.17, and $1,634.92. Petitioner did not report any income from these sales on his returns for the years 1941 to 1943, *232 inclusive. The petitioner failed to include in his professional income on his return the following amounts of rebate payments received from optical companies for each of the years 1941 to 1944, inclusive: 1941
$ 6,104.89
1942
10,028.54
1943
9,497.34
1944
11,814.96
Petitioner failed to include in income on his return for each of the years 1944 and 1945, $2,170 and $2,620, respectively, of the amounts which he received from the abovementioned pediatrician, Joe T. Smith. In September 1954, petitioner was tried before a jury in the United States District Court for the Eastern District of Tennessee, pursuant to an indictment under section 145(b) of the Internal Revenue Code of 1939, charging willful attempts to evade and defeat income taxes for the years 1944 and 1945. Petitioner was there acquitted upon a verdict of "not guilty." Ultimate Facts Petitioner failed to keep adequate and complete books and records for his medical practice and for his other income-producing activities, during the taxable years 1941 to 1945, inclusive. The amounts of petitioner's net income for the taxable years involved are the amounts determined by respondent through use of the so-called net worth method, except for *233 minor revisions with respect to petitioner's personal living expenses for the last three taxable years. A part of the deficiency for each of the taxable years 1941 through 1945, is due to fraud with intent to evade tax. The return filed by the petitioner for each of the years 1941 through 1945 was false or fraudulent with intent to evade tax. Opinion I. The first issue requires us to determine the correct amount of petitioner's taxable income, for each of the years here involved. The respondent, through use of the socalled net worth method, made a determination of petitioner's income for each of said years; and the parties have agreed, by stipulation to the correctness of the assets, liabilities and the adjustments entering into such net worth statement (which is set forth in our Findings of Fact). In only four respects are the parties in dispute, regarding the elements of said net worth statement; and as to these disputed items, the principal dispute centers on the amount of petitioner's cash on hand (as distinguished from cash in banks). As regards such cash on hand, the respondent determined that petitioner had no cash at December 31 of each of the years 1940 through 1944; and as *234 regards the year ended on December 31, 1945, he determined that petitioner had cash in the amount of $14,965.75, represented by a check received in mid-December 1945 from the sale of a farm, which he had not cashed at the year's end. It is our conclusion that respondent was mistaken in determining that petitioner did not have any cash on hand at the end of any of the years 1940 through 1944, and had only the amount of the above-mentioned one check at December 31, 1945. The voluminous record in this case makes it abundantly clear that petitioner rarely ever deposited currency received from his patients, and also that numerous checks from patients and others were kept in his office for such personal uses as making investments, purchasing properties, operating his farms, and paying his personal as well as his business obligations. Moreover, we have found that Olivette, who was petitioner's office nurse and confidential secretary, on occassions put currency into petitioner's safety deposit box. But notwithstanding these facts, petitioner has not carried his burden of proof to establish what amounts of cash he did have on hand at the end of any of the years 1940 through 1944; nor has he *235 established what amount of cash in excess of the above-mentioned $14,965.75 which respondent determined, he had on hand at December 31, 1945. Although, as we have said, the respondent was mistaken in his treatment of the item "cash on hand," we think that such error was harmless in the particular circumstances here present. For, although we are satisfied that petitioner did have an unestablished amount of cash on hand at December 31, 1940 (the beginning of the net worth period), we likewise are satisfied for the same reasons, that he also had an unestablished amount of cash on hand at December 31 of each of the other years 1941 through 1944. We believe, in the absence of any probative evidence to the contrary, that the amount of cash on hand at each of these five dates - all representing undeposited receipts from petitioner's medical practice - was of approximately equivalent amount. Hence, even if we were able to estimate, under the rule of Cohan v. Commissioner, 39 F. 2d 540, the amount of the cash on hand at the opening of the net worth period (which we are unable to do from the present record), we logically would be compelled to find that a comparable amount of cash was on hand *236 at each of the succeeding year-end dates. Thus, the result would be that no change in petitioner's net income computed through use of the net worth method, would be effected; because the assets at each date would thereby be increased by a comparable amount. Also, as regards the cash on hand at December 31, 1945, the amount thereof as determined by respondent ($14,965.75) would similarly have to be increased; and again no change would be reflected in the net income determined through use of the net worth method. Petitioner has contended that on December 31, 1940, he had cash on hand in the amount of $103,781, most of which he had brought from Mississippi to Knoxville in a metal box and thereafter kept in his room at the Medical Hospital and in his father's house; and which he had obtained from the following principal sources: (a) $30,000 by gift from his father-in-law, and (b) accumulation of savings from his earnings after graduation from medical school in 1926 down to December 31, 1940. Insofar as his alleged gift of $30,000 from his father-in-law is concerned, we are constrained to conclude that petitioner has not established that any such gift actually was made. We are not satisfied *237 that his father-in-law had the wherewithal to make any such large gift; for the evidence establishes that he did not file any return of income from 1927 until the time of his death, and also petitioner did not show that the father-in-law possessed a sufficient estate at the time of death to require the filing of an estate tax return. Moreover, petitioner testified that his wife witnessed the alleged gift of money; but despite the fact that she was in Knoxville at the time of the trial and was physically able to testify, she was not called as a witness to corroborate petitioner's testimony in this regard. It is to be presumed, in such circumstance, that her testimony would have been damaging. Wichita Terminal Elevator Co., 6 T.C. 1158, 1165, affd. (C.A. 10) 162 F. 2d 513; W. A. Shaw, 27 T.C. 561, 573, affd. (C.A. 6) 252 F. 2d 681. Nor do we believe that petitioner amassed any significant amount of cash, represented by savings from his earnings during the years 1926 through 1940. His history of filing income tax returns for the period prior to 1941 is set forth in our Findings of Fact; and that history indicates that he had no taxable income from 1927 through 1936, and that he paid *238 only unsubstantial amounts of income tax for the years 1937 through 1940. Also, there is evidence that in the late 1920's and during the 1930's, petitioner was borrowing small amounts on his insurance policies and was purchasing his residence on credit; and that he even bought a refrigerator on installment payments of less than $25, extending over several years. We believe that petitioner would not have followed such practices if he had had on hand the large hoard of readily available cash which he claims to have had. It is to be noted also that, when petitioner first returned to Knoxville and for 2 years thereafter, he and his family lived with his parents on their small farm which was located 15 miles from Knoxville; and that when he and his family thereafter left his parent's farm, they took up residence in a house renting for only $30 per month. There are still other evidences of lack of wealth disclosed in the record; but we need not labor the point. It is sufficient to say that we do not believe that petitioner was telling the truth when he claimed, as he did in his brief, to have had $103,781 in cash on hand at December 31, 1940. The second area of dispute regarding the net *239 worth statement, relates to the amount of "cattle" which petitioner had on hand at December 31, 1945. Petitioner contended that respondent erred in failing to allow him a "loss" for 1945 with respect to cattle that had contracted Bang's disease. The evidence indicates, however, that Bang's disease does not cause death in cattle; but rather it causes the female of the species to be unable to bear calves. Bang's disease first appeared in petitioner's herds in 1944; and thereafter, in each of the years 1944 and 1945, he sold some of the diseased cows for beef cattle. Respondent, in his net worth statement, used petitioner's own records to establish the cost of the remaining cattle which he had on hand at December 31 of each of the years 1944 and 1945; and it would be neither proper nor necessary to reduce these amounts to reflect more reduction in the value of the remaining cattle which had not then been sold. Said claimed "loss" does not appear to have been pressed by petitioner on his brief; but, assuming that such claim has not been abandoned, we regard it to be without merit. We have sustained the respondent's determination as to this item. The third disputed item in the net worth *240 statement is the amount of petitioner's personal living expenses. Respondent has conceded that the amounts of such expenses were less in 1943, 1944 and 1945, than the amounts which he determined in his notice of deficiency. We have accepted that concession; and the amounts as so reduced are set forth in our Findings of Fact. Petitioner has failed to establish that his living expenses were any less than these reduced amounts as conceded by respondent for said years personal living expenses as determined by respondent for 1941 and 1942. Accordingly, we have approved the respondent's determinations on this point, as modified by his concessions. Finally, petitioner has claimed that he had a $12,500 liability as of December 31, 1945, in addition to the liabilities determined by the respondent. He claimed that this liability represents a loan in the above amount, which his father made to him in August 1945. We are not satisfied that petitioner's father actually did make him a loan of $12,500 in currency. The father had only a small farm, and worked as a rural mail carrier for over 40 years. Assuming that the father did have such amount of surplus currency on hand, the evidence is conflicting *241 as to whether the claimed loan was made in 1945 or 1946. There is definite evidence that the father did not make any entry into his safety deposit box from June 1944 to December 1945. In the light of said uncertainties, we are impelled to conclude that petitioner has not established that he was indebted to his father at December 31, 1945, either in the amount of $12,500 or in any other amount. In summary, we hold that petitioner's net income for each of the taxable years involved, is the amount determined by respondent through use of the net worth method, except for the adjustments which we have made for the years 1943, 1944 and 1945 to reflect the respondent's concessions regarding personal living expenses for those years. II. The second issue concerns fraud; and more specifically, it is whether a part of the deficiency for each of the taxable years involved is due to fraud with intent to evade tax, within the meaning of section 293 (b) - so as to justify the imposition of additions to tax under said section for each of said years. Respondent has the burden of proving fraud by clear and convincing evidence. We think that he has borne such burden. There is a consistent and sizable *242 understatement of petitioner's income for each of the taxable years. It is to be noted that petitioner's own evidence presented through his accountant, Davis, showed admitted understatements for each of the years 1942 through 1945, running in amount from almost $10,000 to almost $30,000 for each year. It is well settled that consistent understatements of income over a period of several years are evidence of fraud. See for example, Holland v. United States, 348 U.S. 121; and Shaw v. Commissioner, (C.A. 6) 252 F. 2d 681, affirming 27 T.C. 561. Moreover, in our Findings of Fact, we have shown that specific items of income were omitted from petitioner's return for each of the taxable years - including not only items of professional income, but also items of farm receipts, interest, and capital gains. On his returns, he reported comparatively small amounts of income and also comparatively small amounts of tax, considering the magnitude of his operations. Both his expenditures and his increases in wealth over the years involved, are wholly inconsistent with his reported net income; and we can not believe that he honestly thought he was correctly reporting his income. Petitioner has sought *243 to defend his understatements of professional income by attempting to disassociate himself from the keeping of his records (or lack thereof), from the preparation of his income tax returns, and from the handling of his office receipts. But, after seeing petitioner and those who worked for him (Lela and Olivette), after hearing and weighing their testimony, and after carefully considering all the facts and circumstances relevant to this point, we are satisfied that petitioner was not ignorant of what was going on. Sizable portions of the deficiencies are traceable to his failure to report as income, large amounts represented by checks which were not deposited in his professional bank account, and which were used by him for a multitude of private uses detailed in our Findings of Fact. We do not believe petitioner's testimony in which he said he was unaware that the amounts of these checks were not being reported in his tax returns; and that such failure to report was due solely to the ineptitude of his bookkeeper, Lela. And not even this latter asserted defense is available to petitioner as regards his unreported farm receipts, interest, and gains from sales of property; for it was he *244 alone (and not Lela) who supplied to the accountant McKay (who prepared the returns) the data that went into his returns with respect to these items. Petitioner's case is distinguishable from that of the physician in Wiseley v. Commissioner, (C.A. 6) 185 F. 2d 263. In that case, the Sixth Circuit found that there was no fraud - pointing out that the taxpayer-physician and his principal nurse-assistant (who also kept his books) were so overburdened with work that they were unable to give the necessary care and attention to recording the income. Petitioner, too, was a busy physician; but it appears abundantly clear from the record herein, that petitioner not only had, but took time to run (and keep the records for) four farms, besides being active in the purchase and sale of rental properties, and in making large scale investments in at least two enterprises, the Grubb-Bevins Company and Chapman Drug Company. Also, he was president of the latter company, and received $6,000 for his services in that capacity for part of the year 1945. We are convinced that it was not preoccupation with the healing of the ills of mankind which caused petitioner to understate his income; but rather, that *245 his understatements were due primarily to an intent on his part, to evade taxes on his income. We hold that a part of the deficiency for each of the years 1941 through 1945, is due to fraud with intent to evade tax, within the meaning of section 293 (b). Accordingly, we sustain the respondent's determination that an addition to tax under said section should be imposed for each of the taxable years involved. III. The third issue is whether the statute of limitation contained in section 275 (a) bars assessment and collection of the deficiency and addition to tax for each of the taxable years except 1943 (as to which petitioner did not plead the bar of the statute). We have noted in our preliminary statement that the answer to this issue will depend on whether the return for each of said years was false or fraudulent with intent to evade tax within the meaning of section 276 (a). What we have said above, under Issue II, applies with equal force here. We are convinced that the return for each of the years 1941, 1942, 1944 and 1945 was false or fraudulent with intent to evade tax. Accordingly, we hold that assessment and collection of the deficiency and addition to tax for each of said *246 years is not barred by limitation. Finally, we hold that the fact that petitioner was acquitted in a criminal case involving the years 1944 and 1945, in no way affects his civil liabilities involved in the instant case. Said acquittal is not res judicata of the issues here; and the present proceeding does not subject petitioner to "double jeopardy" within the meaning of the Constitution. Helvering v. Mitchell, 303 U.S. 391; Hoefle v. Commissioner, (C.A. 6) 114 F. 2d 713; and William G. Lias, 24 T.C. 280, 321, affd. (C.A. 4) 235 F. 2d 879. By reason of our foregoing holding that a part of the deficiency for 1942 is due to fraud with intent to evade tax, we do not reach the alternative issue raised by respondent with respect to the Current Tax Payment Act of 1943. Decision will be entered under Rule 50. Footnotes
1. All section references herein are to the Internal Revenue Code of 1939, as amended, unless otherwise specified.↩
2. The particular appointment books received in evidence all bore the printed name of "Russell G. Tappan, M.D."; but they apparently illustrate the type of appointment book used by petitioner.↩
3. There is a conflict in the evidence as to the manner in which this cash was handled. In an affidavit which Lela executed and delivered to a revenue agent in 1948, she said: 6. All currency received in the course of a day was turned over to Dr. Grubb personally which he accumulated in a file drawer of a metal cabinet in his office. The key to this cabinet was kept in my desk. It was my impression that he used this currency for investments, paying loans and other personal transactions. At the trial, however, the substance of the testimony presented on behalf of the petitioner was: That the receptionist at the end of the day placed the accumulated cash receipts in a file cabinet in her office; that from time to time thereafter petitioner's nurse, Olivette, would remove this cash and place it in a locked cabinet in petitioner's office; and that the petitioner neither received nor had access to such accumulated cash receipts. After seeing the witnesses and hearing them testify, we have concluded that the above statement set forth in Lela's affidavit correctly reflects the manner in which the cash was handled.↩
4. There is also a conflict in the evidence respecting the handling of the checks representing rebate payments to petitioner from the optical companies. We have concluded that Lela's statement in paragraph 8 of her above-mentioned affidavit of 1948 correctly reflects the manner in which such checks were handled. See Footnote 3 ante.↩
4a. It is to be observed that the total amount indicated as the initial deposit, $18,045.43, is $3 less than the sum of the currency and checks indicated as making up the deposit. All of these figures were stipulated by the parties, and the record does not reveal the cause of the $3 discrepancy. The parties further stipulated that "petitioner's investment in Grubb-Bevins Company during the year 1944 totalled $17,985.43." Our Findings of Fact, page 13, ante, reflect this stipulation. Presumably, the difference of $60 between the stipulated amount of the initial deposit and the stipulated amount of the petitioner's total investment, is accounted for by adjustments to petitioner's capital account after the time of the initial deposit on December 19, 1944, and before the end of the year 1944.↩
1. The record is not clear on the point, but apparently these amounts were either negotiated at the bank or used by petitioner to make payments on his note obligations at the bank. There is no indication that petitioner had any account in the Bank of Knoxville other than the professional bank account and the trustee account; and the above amounts were not deposited in either of these accounts.↩